INDUSTRIAL TRUST COMPANY *et al, Tr. vs.* PRESIDENT AND FELLOWS OF HARVARD COLLEGE *et al.*

JULY 7, 1943.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

FLYNN, C. J.   This bill in equity for the construction of the will of Gertrude E. Guiteras, late of Bristol, Rhode Island, deceased, and for instructions to the executors and trustees relative thereto was duly certified to this court in accordance with general laws 1938, chapter 545, § 7.   All parties having any interest therein, including the attorney general of the state, were joined as respondents.   All individual respondents were of full age excepting one minor, whose interest was represented by a guardian *ad litem*.   A decree *pro confesso* was entered against two of the respondents, Captain George G. Guiteras and the First Congregational Church in Bristol.   All other respondents filed answers and joined in the prayer in the bill for certification.

The will was executed on May 18, 1932 by Gertrude E. Guiteras, who died December 30, 1940 in the town of Bristol where the will was later probated. The complainants are the duly appointed executors and trustees thereunder. The will provides, in paragraphs first to third, inclusive, for the payment of debts, *etc.*, nomination of executors and trustees and the payment of legacies free and clear of all taxes.

Paragraph fourth, concerning which most of the questions relate, reads:

> "I hereby direct my executors to deliver all tangible personal property herein bequeathed, to make payment in full of all pecuniary legacies of not more than one thousand dollars ($1000) herein contained and to make payment of one thousand dollars ($1000) on account of all pecuniary legacies of more than one thousand dollars ($1000) herein contained, within fourteen months from and after the final probate of this, my Last Will and Testament and, except for such sales of my personal property as may be required for such deliveries and payments, the administration of my estate and the payment of taxes, to hold my intangible personal property intact until the securities in my estate shall return to the total average value of said securities during the period from January 1, 1924, to January 1, 1929, but in no event for a period exceeding five years from and after the final probate of this, my Last Will and Testament, and all the legacies herein contained are hereby made subject to this provision."

Paragraphs fifth to twenty-ninth, inclusive, provide for twenty-five different pecuniary bequests of $1000 each, and for fourteen other pecuniary bequests, each in excess of $1000, totaling $110,000; and paragraphs thirtieth and thirty-first concern bequests of certain articles of jewelry.

Paragraph thirty-second, which is also involved by certain of the questions, reads:

> "I give and devise my lot of land together with all the buildings and improvements thereon situated on the southwest corner of Hope and John Street in said Town of Bristol, and my lot of land situated on the southerly side of John Street, in said Town of Bristol, unto the

First Congregational Church in Bristol, Rhode Island, the same to be and remain to it, said First Congregational Church, in Bristol, Rhode Island, and its successors and assigns forever, but upon the express conditions that it shall never be used for commercial purposes and that it shall never be alienated, and, if at any time the said conditions be broken that the said described real estate shall thereupon become a part of my residuary estate hereinafter provided for. I hereby direct my Executors heretofore named to repair and put in suitable condition for occupation as a dwelling the south half of the dwelling house on the lots of land first mentioned in this paragraph within three months from and after the final probate of this, my last Will and Testament, and that the expense incurred in doing so be borne by and from my estate. It is my wish that said house located on the land at the southwest corner of Hope and John Streets, in said Town of Bristol, be used by said First Congregational Church in Bristol, Rhode Island, as a parsonage whenever in the judgment of the Trustees of said First Congregational Church in Bristol, Rhode Island, it is practicable to use it for said purpose."

By paragraph thirty-third the testatrix devised and bequeathed her residuary estate to the complainants to be held for certain purposes under three separate trusts. The trustees were directed to manage and maintain her homestead and other real estate in Bristol in accordance with expressed provisions; to evaluate her personal property and to segregate and set aside therefrom "securities or bank deposits or partly securities and partly bank deposits" to the value of $10,000, to be held as fund A, the net income therefrom to be paid to Mary McGuire for her life and on her death the principal to be paid into fund C; to segregate and set aside securities or bank deposits or both of the value of $50,000 to be held as fund B, the net income from which was to be paid to the town of Bristol for repairs to the Guiteras School Building; and to set aside and hold the remainder of her undisposed of property, real and personal, together with the net income from her homestead and other realty and payments from fund A as above mentioned, as fund C, the net

income of which was to be paid to or for the benefit of such free public library or libraries in the city of Matanzas, Cuba, as the trustees should select.

Paragraph thirty-fourth reads in part as follows:

> "I declare that the executors, or the survivor of them, for the time being of this my will shall have and possess full power during the administration of my estate to sell or otherwise dispose of, at public or private sale or broker's board, for cash or on credit, any or all of my estate, real and personal, not hereinbefore specifically disposed of."

By paragraph thirty-fifth all other and former wills are revoked.

It appeared in evidence that an inventory of the personal estate was filed on May 14, 1941 which may be summarized as follows: Bonds, $180,640.59; stocks, $223,319.06; bank deposite, $135,760.10; furniture and jewelry, $3,323.50; interest as legatee under the will of Isabella M. Wardwell, $5000; cash, accrued interest and dividends, $4949.64; total $552,-992.89. The above securities were further divided into three groups, namely, (1) stocks and bonds that were in existence and owned by testatrix during the period 1924 to 1929 (exhibit E); (2) stocks and bonds that were in existence during that period but were not acquired by testatrix until after January 1, 1929 (exhibit F); (3) stocks and bonds which were not issued until after January 1, 1929 (exhibit G). Evidence was introduced to show the inventory values of the above classified securities, their market values on November 10, 1942, and the average market value of such securities between January 1, 1924 and January 1, 1929, excepting, of course, the above-named third class which had no existence during that period. The total appraised value of this last class was $109,571.17.

The testimony of three stockbrokers was introduced which amounted to individual general opinions, substantially, that it was unlikely or practically impossible that the securities, which had an average value in the period from 1924 to 1929, would again reach such average value within five years from

the probate of the will; that it would be unwise to hold the general list of securities for expected appreciation to come before 1946; that prices generally were apt to be lower because of uncertainties resulting from war conditions and the imposition of taxes; that it would be for the best interests and conservation of the estate if the executors had general power to sell the securities, although some stocks and bonds, not otherwise identified, should not be sold; that there was a "possibility" of depreciation if the executors did not have such authority; and that the average value of these securities in 1942 was lower than it was in 1941.

It also appeared in evidence that the executors had paid, as directed by paragraph fourth, all the pecuniary legacies of $1000 and also $1000 on account of each of thirteen other pecuniary legacies in excess of $1000, one such legacy having lapsed; and that the executors could pay the balance of all specific and residuary legacies, the debts, the expenses of administration and taxes, and thus turn over the residuary estate to the trustees under the will, if the securities were sold, or if the executors could use the available cash plus the proceeds of the sale only of the securities in the above-named third class.

The first questions propounded are: "1. May the executors in exercise of the general powers in the will sell securities of the testatrix notwithstanding the provisions of the fourth paragraph of the will, if the executors determine that it is advantageous to the estate to sell such securities? 2. May the executors sell securities of the testatrix notwithstanding the provisions of the fourth paragraph of the will if the executors determine that such securities are poor investments and likely to depreciate in value? 3. Do the provisions of the fourth paragraph prevent the sale of securities which the testatrix did not own during the period January 1, 1924 to January 1, 1929? 4. Do the provisions of the fourth paragraph prevent the sale of securities not issued until subsequent to January 1, 1929? 5. May the executors use available cash for the payment of legacies in excess of $1,000, not-

withstanding the provisions of the fourth paragraph of the will?"

As to, these questions the complainants contend chiefly, first, that the general powers of sale granted to the executors in the thirty-fourth paragraph should prevail over any particular directions to the contrary appearing in paragraph fourth; and second, that notwithstanding the provisions of paragraph fourth this court has the power to authorize the executors to deviate from the express provisions of the will and to sell any of the securities that in their opinion are likely to depreciate in value or that may be sold to advantage. They argue that there is no point in holding cash for appreciation; that those securities having an average value in the period 1924 to 1929 are not likely to again reach that average, at least before 1946; that because of the uncertainties of war and possible emergency conditions thereafter, some of the securities should be disposed of quickly; that the third class of securities were not issued until after January 1, 1929 and therefore could never "return" to the total average value in the period 1924 to 1929; that there is a strong possibility of depreciation or loss if some securities are held; and that the executors are in a better position to judge the market possibilities of the securities than was the testatrix.

In our opinion, paragraph thirty-fourth giving general power to the executors to sell securities "not hereinbefore specifically disposed of", was not intended to be read literally and alone but was intended to be read together with the express provisions in paragraph fourth. To hold otherwise would result in contradictions that could not reasonably have been intended by the testatrix. Her intent to have the executors hold her intangible personal property intact pending specified events, generally speaking, seems clear from the language in paragraph fourth. She there established her own standards of value and prescribed the limits of time during which the executors were expressly directed to hold her intangible personal estate intact. The legacies then were made expressly subject to these directions; and she lived

324

eight years after the values of securities had dropped to the lowest level attained since 1924, but she never changed any of such directions. If the complainants' construction of paragraph thirty-fourth were adopted, the provisions and directions in paragraph fourth would be substantially nullified.

We think these directions are too explicit to be disregarded entirely and that both paragraphs were intended to be given reasonable effect. This can be done by holding that the first two classes of securities, which had existence between 1924 and 1929, came within the exception "not hereinbefore specifically disposed of" appearing in paragraph thirty-fourth. That exception excluded from the general power of sale not only the specific property, which had been bequeathed, but also those securities which were specifically, in paragraph fourth, assigned or appointed to a place or condition, that is, to be held until they should return to the total average value during the period from 1924 to 1929. The third class of securities could never meet the imposed condition because they were not issued until after January 1, 1929. The testatrix presumably knew this and therefore probably intended that they could be sold under the general power of sale given to the executors in paragraph thirty-fourth but that the other property and securities were intended to come within the exception and to be excluded from such general power of sale.

But complainants next argue that notwithstanding the express provisions of paragraph fourth, this court has power to authorize a deviation therefrom by the executors and that such power should be exercised here because of alleged emergencies due to war and the possible effects thereof in the future. Granting that this court may have such extreme power in a proper case, we think that it should be exercised always with the greatest caution and only upon a showing which leaves little or no doubt that loss and impairment of assets are imminent and inescapable, thus making it substantially impossible, unless relief is granted, to carry out the testatrix's paramount intention. The transcript here has not convinced us that the executors are presently confronted

with such impending loss or impairment to the assets of the estate, having in mind the testatrix's expressed intent, as would warrant a grant of blanket authority to deviate from such directions in the will. The evidence is essentially mere opinions, by individual stockbrokers, of possible trends in the future market values of securities generally; and these opinions as to a probable continuation of decline in values are apparently not supported by the present values in certain of these securities. There is no identification of the securities which are in alleged danger of immediate substantial loss or impairment; nor any particular reasons, from analysis of inherent values, which would lead to that conclusion as to any designated security. The opinions and reasons given are based on generalizations concerning "possible" emergencies and market conditions that may or may not be fulfilled. In any event, we think that we should not be expected to grant, upon such general speculation and scanty evidence, such a broad authority to deviate substantially from the express terms of a will.

The complainants also argue that there is no point in holding the cash on hand for appreciation and that this money should be made available toward payment of the balance of outstanding legacies, so that the residuary estate could be turned over to the trustees. This argument is not without some force but the answer here, so far as it concerns the cash on hand, is found in the mandatory terms of paragraph fourth. The testatrix therein expressly directed that her executors pay only $1000 on account of these legacies and hold her intangible personal estate intact for a specified time. Then she expressly made all such legacies subject to these directions, although she had this very cash to pay them if she had so desired. Granting that holding the cash on hand and postponing the payment of the legacies may not substantially increase the assets or values in the estate, nevertheless we are required to construe her intention from what she expressly stated in her will rather than to pass on the merits of reasons which may have prompted her action or

the relative knowledge or market trends possessed by the executors. Therefore, we decline at this time to authorize the executors to deviate as requested from the express terms of her will as herein construed.

For the above reasons questions 1, 2, 4 and 5 are answered in the negative and, with the exception of the third class of securities, question 3 is answered in the affirmative.

Question 6 is: "May the executors make payment of any part of the residuary legacy notwithstanding the provisions of the fourth paragraph?" In our opinion, the testatrix did not intend that the residuary legacies be postponed under the restrictions expressed in paragraph fourth; but she intended that the trusts be set up and commence reasonably after a year from final probate. The residuary trusts are three in number. The first and second are in specific amounts, namely, $10,000 and $50,000, respectively. The third is made up of the remainder. Under the first, fund A, an annuity for Mary McGuire was to be paid to her monthly during her life. The other residuary trusts, funds B and C, were for educational and charitable purposes. However, the testatrix, so far as their commencement was concerned, did not differentiate between such annuity and the other residuary legacies that were clearly not annuities. On the contrary, she used the same form and general language in directing that each of these trusts be segregated and set up separately.

Ordinarily an annuity, as was the case in the residuary legacy to Mary McGuire, would begin at the testatrix's death and would draw interest from that date. *Frelinghuysen* v. *New York Life Ins. & Trust Co.*, 31 R. I. 150; *McCrillis* v. *McCrillis*, 49 R. I. 240. But here a consideration of the plan underlying the testatrix's directions to postpone payment of certain legacies in general, and the nature, form and extent of her other bequests to Mary McGuire, in particular, indicate that this residuary legacy was not intended to begin until a year from final probate. If the commencement of these trusts were postponed for possibly five years, as directed in paragraph fourth concerning other legacies,

Mary McGuire, being of advanced age, might never enjoy any benefits therefrom. Manifestly, the testatrix thought a great deal of her and did not intend such a result. On the other hand, the testatrix's provisions for Mary McGuire elsewhere in the will indicate an intention not to have residuary trust fund A commence until a year after final probate.

In paragraph twenty-ninth she had given Mary McGuire a legacy of $5000 and also "the use and occupation rent-free of my homestead estate for the period of one year from and after the final probate" and directed her executors "to supply provisions, food, light, heat and other necessaries for said Mary McGuire in said residence", as well as to pay the expenses and taxes thereon. By these gifts the testatrix apparently intended to provide so completely for Mary McGuire during a year after probate that the latter would require no other income in that period. Thereafter her need for regular income would begin and the trust was intended apparently to supply that need. From these and other expressions in the will we think the testatrix's intention was to make all the residuary legacies begin, so far as reasonably possible, after a year from final probate.

It appears clearly that the estate is ample to pay all pecuniary legacies, debts and administration expenses. More than a year has elapsed so that the amounts of all claims are known. The executors and the trustees are identical. Under the residuary trusts, the trustees were given ample authority, without recourse to any court, to segregate and set up out of the securities or money, or both, funds A and B, which are in specific amounts, and the remainder, in fund C.

We concede that executors usually make their final accounting before turning over the estate to residuary trustees. Nevertheless the testatrix apparently intended to have the residuary trusts set up, so far as that could be done without preventing the executors from performing their duties with reference to other legacies and property in the estate. If the executors can set aside enough of the per-

sonal property to insure satisfaction of the outstanding legacies and expenses of administration and taxes in accordance with the expressed provisions of the will, we can see no illegality in permitting the trustees to segregate and set up trust funds A, B and C out of the personal estate not required for the other expressed purposes. This would not conflict with but would carry out the express intent of the testatrix, and it would give some effect to all provisions as far as reasonably possible and legal.

The next questions are: "7. Should any income collected during the period prior to full payment of the legacies be paid to the legatees other than the residuary legatees and, if so, in what manner? 8. Are the legatees entitled to interest on their legacies prior to full payment and, if so, in what amount and for what period?" Unless otherwise provided in the will, interest on a general pecuniary legacy is not payable for the period of one year from and after the testator's death. G. L. 1938, chap. 566, § 40.

In the instant cause the provision in paragraph fourth that the executors not pay all of these legacies but hold the personal property intact is mandatory, except as above construed, and the specific legacies therein are expressly made subject to such provision. In such circumstances we do not believe that the testatrix intended that those legacies were to carry any interest until such time as the executors were entitled under the will to make payment thereof. Nor do we think that it was her intention to pay in addition to the legacies, any part of the income which might be earned generally by the estate in the course of its administration and settlement. All such legacies were generally pecuniary and not demonstrative and there is no direction, request or indication in the will that they should be segregated so that income peculiar thereto, as distinguished from statutory interest, could be determined. We therefore think that questions 7 and 8 should be answered in the negative.

Question 9 is: "What repairs are the executors required to make to the south half of the dwelling devised to the First

Congregational Church of Bristol, and what amount of money are the executors required to expend for such purpose?" There is evidence concerning the character, condition and cost of making repairs to the house in question in order to make it suitable for occupancy as a dwelling, as called for under the will. In our opinion, the language of the will concerning the use of this house by the First Congregational Church as a parsonage is merely precatory and we do not think that the church thereby received the right to dictate the nature or amount of the repairs to be made to the premises. That obligation was left by the testatrix expressly with the executors and the reasonableness of the repairs must be determined by them in conformity to their obligations under the will. Having in mind, however, that the testatrix expressed a wish that the house be used as a parsonage, whenever that use was deemed practicable by the trustees of the church, we think that such use, if decided upon, would be one element to be considered by the executors, provided the church trustees shall have given notice, before the repairs are begun, of their definite decision to use this dwelling as a parsonage. Other than setting out, as above, the general standard for guidance of the executors, we think it unnecessary in this proceeding to answer this question in further detail.

Question 10 is: "Are the conditions against use for commercial purposes and alienation and the gift over to the residuary devisees valid as set forth in the devise to the First Congregational Church in the thirty-second paragraph?" In our opinion, the effect upon the title, of a future possible breach of conditions expressed in the original gift for charitable purposes, has no present bearing on the administration of the estate or the trusts thereunder, so as to require an answer now.

On July 12, 1943, the parties may present to this court for approval a form of decree, in accordance with this opinion, to be entered in the superior court.

330

*William T. O'Donnell, Ralph M. Greenlaw, Edwin J. Tetlow,* for complainants.

*John H. Nolan,* Attorney General, *John E. Mullen,* Assistant Attorney General, for state.